16-0823, people of the state of Illinois, Clinton, Atherley, Henry, Shaw, R. Helgesen, Lieutenant Colonel, Cardinal Wally Gatlin, Lieutenant Colonel, Mr. Christopher Cronson. On behalf of Clinton, Atherley, Ms. Lisa Ann Potter. Good morning, Counsel, and Mr. Cronson, you may proceed when you're ready. Thank you. On behalf of my partner, Brett Cronson, we represent Sean Helgesen. He's the defendant appellant here before your honors. When I first met Sean Helgesen, it was in the spring of 1993. It was somewhere within a week or two of him having committed this crime with an acquaintance, a person by the name of Eric Robles, who Eric Robles was also a juvenile at the time of this offense. And at that point, Sean Helgesen, he had been a sophomore in high school, 17 years of age. He had turned 17 in February, so approximately two or two and a half months prior to this occurrence. And his focus at that time was somewhat awkward. He was very focused on attending the junior prom. He was a sophomore, he couldn't go. He did have a girlfriend who was a junior and they had been making plans to go to the prom. And so that was kind of a primary focus of his at that time. And as things proceeded through the trial over the course of two years, his effect was mostly a lot distant. But a lot of the other times in court he would be careful, he would be sobbing, he would be crying. I know that Judge Nelligan commented on that at the original sentencing. Judge Nelligan's thoughts were he didn't believe that Sean Helgesen was showing remorse, that rather Sean Helgesen was basically fearful for what his future held, which could be understandable for at that point he was a 19-year-old kid. His allocution at the original sentencing I think is important because I think it reflects on who he was at the time and how he viewed things. He still viewed things obviously through the mind of a child, a juvenile. He lashed out at the state. He lashed out at Eric Robles, who was his co-defendant. Basically placed blame everywhere except inward. And then we fast forward. I next met, re-met Mr. Helgesen after he had been resentenced after remand on Miller to 100 years. And that was in the spring now of 2016, so it was 21 years later. And at that point I found Sean Helgesen as described by the sentencing judge on resentencing after Miller. I found him to be a changed person, which is what the sentencing judge found. After seeing everything about him and getting to know him and reviewing his sentence and filing his supplemental motion for rehearing, for reconsideration of the sentence, I found that the things that the sentencing judge had said were true. He had educated himself. He had been a well-behaved prisoner. He had expressed remorse, and the remorse was for the Robles family in addition to what he had brought upon his own family. And after considering everything that had been said at the sentencing hearing by the sentencing judge, I wasn't able to understand how, with all those things, we ended up with a 100-year sentence. It would seem to me that a 100-year sentence, and I'm suggesting to this court, that a 100-year sentence would go to those types of people, if not a life sentence, that Miller and Montgomery were talking about as being implorable. But this obviously is not an individual who is implorable. And as Miller and Montgomery said, those lengthy types of sentences should be reserved for all but the rarest of children because, as we know, children have the greatest capacity to reform themselves, the greatest capacity to continue to grow, and that's what we saw in this case. And so it was a very difficult situation that I had coming to terms with the sentence that had been meted out in this case based on all the things that Mr. Halverson had gone through. And he's been in one of the worst prisons in our system, obviously, maximum security prisons. They're not, you know, it's not the East Bank Club. It's a difficult place. It's a difficult place to adjust to as a 19-year-old. It might have been more difficult or easier to adjust to if he had the type of background that, unfortunately, we see with a lot of people that get sentenced to these lengthy prison terms in our maximum security prisons. And that's a background based in gangs, based in violence. But he didn't have any of those types of things. But, counsel, the fact remains the judge still had to consider the offense. And the offense, as described by both judges, both Judge Nelligan and Judge McAllis, I believe, are consistent. It was horrific. It was grisly. It was the worst, I think, Judge Nelligan said that he had seen in his time at that point on the bench. I don't think Judge McAllis would have gone to that length. But he did talk about the horrific nature of the offense, which has to be taken into account. And, Justice Hutchinson, I have no quarrel with that. But it cannot be, as the sentencing judge stated, the overriding concern. It can't be the overriding concern and be consistent with what the United States Supreme Court has said in Graham and Roper and Miller and Montgomery, in which Justice Sotomayor recently said that the overriding concern in these cases has to be the age of the juvenile. It has to be their capacity for change. And it's clear, it's replete from the sentencing hearing. And if you look at the last sentence in the memorandum of opinion that the sentencing judge issued here, if that doesn't smack of retribution, if that doesn't smack of vengeance, then I don't understand the English language. So that's my quarrel with it. Yes, I understand, and we wouldn't have Graham and Roper and Miller and Montgomery if these weren't horrific crimes. Well, you're not talking about a North Carolina v. Pierce argument that this is the judge's, you know, there's nothing in this record that I think talks about that. And I don't even think that that was argued in this case. So retribution, where is that coming from? Well, that's how I read the final statement of the memorandum of opinion that was issued by the sentencing judge. That's what I take it to be. When I see that I'm sentencing you to a sentence that's probably going to be very close to your last breath on the face of the earth, at that point you will have a chance to be released into society, which is more than I can say that you did for the Robles family. And factually, Twilight, that will provide Mr. Hugginson with the possibility of enjoying some years of freedom during the twilight of his life. He's already said he'll be released at 66. I'm not sure that that's the twilight, but we'll take, you know, we'll take that as given, which was more than he allowed Peter and Diana Robles to enjoy, which in fact is true. They're dead. I can't argue with the facts, Judge. I'm only arguing with what I understand and perceive that to be, especially in conjunction with all of the other things that were said about what was the overriding concern in handing out this sentence. And so what I'm suggesting to this court and your honors is that that cannot be the overriding concern. The overriding concern cannot be the offense itself. It can be a factor. And our amended statute now says it can be a factor, but it can't be the overriding factor. And that was said time and again in this case. And I think that it's made worse by virtue of the fact that two times when given the chance to re-sentence Sean Helgeson, the sentencing judge both times clearly ties it to the sentence of his co-defendant, if you want to call him that, Eric Robles. Eric Robles ended up, his case got remanded because it was a problem with the rebuttal argument. Eric Robles makes a deal with the state and pleads guilty and gets 100 years. It's under Miller and Montgomery, Graham and Roper, you cannot tie the sentence of a juvenile to that of another because you're not taking into account his individual particular circumstances. But when he reduced it to 90 years, he did not, he specifically said that he was not tying it to Eric. He again said that an appropriate disposition is a disposition similar to that that was received by Eric Robles. And I think 90 years is a disposition that's similar to that. And I think it shows that the sentencing judge is tying himself to that sentence for whatever reason. And we, when I talked with Sean Helgeson about this and about his appeal, one of his questions to me was why can't you bring up in front of the appellate court the fact that this person's been sentenced to 50 years on a juvenile life re-sentencing, this person's been re-sentenced to 52, this person's been sentenced to 60. And I said I can't do that because my argument before this court is, and I think it's the only legitimate argument, you must be sentenced based upon your personal characteristics. You cannot be sentenced based upon what somebody else got sentenced to. So I wish I could stand in front of you and list all the other juvenile lifers that have been re-sentenced to 60 years or less. But I can't do that in good conscience because then I wouldn't be emphasizing the personal characteristics of Mr. Helgeson, which I believe stand alone. And I believe based on what he went into prison with as a 19-year-old with half of a sophomore education, and the person that he has become today, it makes no sense. Essentially what the sentencing judge said, well, he said, you've shown that you're rehabilitated. You've shown that you don't create any danger to anybody out in the general public. By the time he's 62 or 66, he doesn't say today. I don't see that word in his disposition. So I did not take those remarks to mean that the sentencing judge was looking into a crystal ball and saying, in the future, because how could we possibly know what Sean Helgeson is going to do from this day forward? So I took it to mean that the sentencing judge was saying at this point, this is what I see in this person. I see a changed individual, he said. I don't see a person who poses a threat to society. Now, Justice Hutchinson, if you're telling me that you feel that what he was saying is if he spends another 20 years in prison. Well, that's another reading that could come from that. But here's another problem. We've faced this type of resentencing based upon what happened several years ago. In some cases where jury verdicts were, or not jury verdicts, rather guilty pleas were taken, and then there's some issue of what the understanding was because somebody was taking medicine at the time. Those were very hard to deal with. This is similar. He's being sentenced and was told to be sentenced, resentenced, based upon the factors at that time. And if I take your argument literally here, you're saying maybe we should, you know, we should look at him as now an adult, and if that were the case, he could be looking at a mandatory life sentence. Well, I agree, but Justice Hutchinson, my understanding of what Milner, Montgomery, and Graham and Roper are saying is that that's what we're doing now. I'm distinguishing this from Holman. I understand that Holman, they're saying it's backward looking, okay, because that was a sentence that was meted out at the time. And I think Holman's a singular case. He had committed three murders apparently. So I do understand the current United States Supreme Court jurisprudence is saying you're sentencing the person for what he is right now, and you are to take into account the things that he has done since he has been in prison. Otherwise, I would agree that's just a Holman situation. at the time of the offense, but clearly I don't think that's a fair reading of what the United States Supreme Court is saying that we need to do in these cases. Why else would they say that juveniles are subject to change, that their character is going to be formed over time? All those words would just be mouthed uselessly if that was the statement. Miller said, and I have it here, that we observe Miller, and this is our Supreme Court, we observe Miller does not invalidate the penalty of natural life without parole for multiple murders, only its mandatory imposition on juveniles. So that's what we're looking at, I think, when it comes back for resentencing, or the trial court is, because we're not doing it. If someone received a mandatory life sentence, and that is what happened in this case with Judge Nelia, Judge McCallis then had to look at what other factors should I have considered, which is what he did back at the time, not how well he's doing today, because as I said, he's an adult today, and I don't think Miller's telling us we can sentence him as an adult and not put him in on a mandatory life sentence. But why would the United States Supreme Court comment on the transient immaturity of youth if they didn't mean that you have to look to see what this person has done since then? Because all these cases are horrific, Your Honor, and if we were just to resentence them based on if we were going to stop in time in April of 1993, well, of course, you'd sentence them to life in prison. It's an horrific crime. As long as it wasn't mandatory. As long as it wasn't mandatory, right. And we haven't even touched on the whole issue of why the general procedural rules have just been sidestepped in this case and why Shawn Helgeson was never given notice. The state argues for the first time on appeal that it's exceptionally brutal and heinous, indicative of wanton cruelty. They never notified him that they were going to seek an extended sentence based on that. He was never given a chance to defend against that. And so that's the whole other portion of this case that's so troubling, is the state basically has taken the position in the trial court and here on appeal that basically the rules don't apply. Apprendi doesn't apply. 111-3C-5 doesn't apply. These are procedural niceties, but maybe they don't apply to the people who are being judged by the worst moments in their life. People who have committed double murder. Do you have any authority to the effect that Apprendi should apply? Well, I think People v. Swift is the Illinois Supreme Court. There have been other cases that have applied to Apprendi, and the state hasn't made any argument before you as to why Apprendi should not apply. They're strictly silent on the issue. Well, this case was well over. All of the appeals directs otherwise were over by the time Apprendi was decided. And the Supreme Court's made it clear that we don't go back that far. If it was pending at the time, as in Ford, we have to consider it. If not, it's not that consideration. Well, but once it's back and it's back from resentencing, then the rules reapply again. Well, it depends on which sentencing structure you're going to look at. If you're looking at current, but you were being sentenced, or not you, pardon me, Mr. Heveson was being sentenced under the statutory authority at the time, and he had the right to opt for that, or that was the case. And Apprendi was not an issue at that time. No, I understand. It was pre-Apprendi. Okay. But the bottom line is when he comes back for a sentencing hearing, why would he not be allowed the same procedure that anybody else would have been allowed, which is we're trying to give you an extended term. His public defender filed, and I think correctly, a memorandum suggesting that the proper sentencing range was 20 to 60 years. The State, in opposition to that, never said anything in terms of notice. They never said anything in terms of we're trying to establish an extended term through extremely brutal and heinous behavior. So he never had a right to defend against that. I think he should have had a right to a jury with respect to the resentencing. It's not as if he was unaware that the State was seeking a life sentence, correct? So how would Apprendi even actually have any effect on this? Everybody knew, including the defendant, that the State is seeking to confine him for his natural life. So what's the point? Well, because— And it's not as if a jury would have to re-adjudicate that. I mean, this is—it's a point that really has no purpose, I don't think.  No, he was told we're trying to resentence you to life in prison. What I'm suggesting to the Court is, and I'm asking, why wouldn't he have been entitled to a jury trial at resentencing if the State notified him that we're going to try to give you an extended term, something above the 20 to 60 years, we're going to notify you in writing in conformity with both State statute and Apprendi, we're seeking to give you an extended term sentence, and then why wouldn't he have been able to say, okay, that's fine, but I'd like to have a jury on that issue, and I'd like to have the jury determine, whatever basis it is, beyond a reasonable doubt. Well, there's no authority for that, though, is there? To actually implement that procedure? I mean, it's a nice idea, but I don't see any authority anywhere to provide for that kind of procedure. Well, why wouldn't SWIFT apply? Where in SWIFT, basically, they said the sentencing parameters were only 20 to 60, it's post-Apprendi, and so we're sending him back, and we're saying, pursuant to Supreme Court rule, that you can only sentence him up to 60 years. Why wouldn't that be the same situation here? I don't understand why that wouldn't apply. Well, I think because other factors were involved, as well as other statutory authority was involved. I mean, the state doesn't, and I would please ask that the court not make arguments for the state. The state didn't make the argument. Well, you asked me, so I just answered. Okay. I'll let your expense answer. I apologize. But, I mean, the state has never set forth a scenario here under which they claim that this sentencing procedure was proper. They basically just say, since he could have been sentenced to life imprisonment under the statutory scheme that was in effect at the time that he was convicted, well, then everything else is appropriate. And I think Morphin, out of the First District, speaks to what I'm saying. In Morphin, keep in mind what they said is he could have been resentenced, and they're sending him back for resentencing. So they're sending the primer back, Morphin is, and they're saying you can resentence him to 20 to 60, and if under appropriate procedures you could give him an extended term sentence, up to 100 years, or you could even give him life in prison. But those procedures are there for a purpose. He's entitled to notice. It's a clear due process Fifth Amendment argument that he, Sean Helgeson, is entitled to notice. What is it that you're basing it on that you're saying you can give me an extended term sentence? He was never told that. He was just basically told, well, you could have gotten life before. The state relies on Ford for that argument. And Ford helps them in no way with that, because in Ford, the defendant was previously found eligible for the death penalty beyond a reasonable doubt. And so I agree that under those circumstances, okay, that, yeah, everything's on the table. Okay, you've been found guilty, or I'm sorry, you've been found eligible for the death penalty. Under the old law, there were no factors sufficient to preclude the imposition of the death penalty. That was found beyond a reasonable doubt with respect to Ford at the prior proceedings. So then when Ford comes back to re-sentence it, yes, he can get life, he can get death, he can get anything. It's been previously established. But in this case, the elements that I guess the state seeks to raise for the first time on appeal, those were not established at the trial. It was pre-apprending. So I... Well, we'll let counsel make her own argument. Okay, I apologize for taking so long. Since your time is up, you'll have an opportunity to respond. Thank you. Good morning. May it please the Court, Lisa Hoffman on behalf of the people of the State of Illinois. With the Court's permission, I would actually like to begin briefly, because I am sure that there are many other things that we could get to, but briefly where Mr. Cronson started, which is with the judge's decision. And I must admit, I've never met Sean Helgeson, and I did not, I never even attended any of these sentencing proceedings. So I have nothing to go on. I can say that I am respectful and pleased that he has been a successful prisoner. And that, you know, perhaps this is an indication that the rehabilitative portion of imprisonment can be successful. And I think that the Court was very mindful and respectful of that fact. I think his memorandum opinion at the original sentencing prior to then he took the 10 years off on a motion to reconsider. But that original sentencing memorandum and the second sentencing indicate that the judge was very aware and very mindful that Mr. Helgeson had been a fairly model prisoner that had, you know, grappled with many things over the course of his imprisonment. I do not think that the sentencing judge indicated retribution, overriding everything else. I think that what the defendant would have is that you could never consider the nature of the offense. You could never consider the victims because those things are, you know, those are bad things. Those are nasty things. I think Counsel said those are looking at what is the worst day of someone's life. Well, yes, but unfortunately in this instance we have two people that are dead and died in an extraordinarily horrific manner. And so it's wonderful that Mr. Helgeson has changed and the Court gave that appropriate consideration in resentencing. I do not think that there is anything about the judge's sentencing order that indicates that he was not aware and mindful of the Miller factors. He gave consideration to those things. He gave an extraordinary consideration to rehabilitative purpose. So that's that. I mean, I think it's an interesting argument that Counsel makes that he's done so well. He's now an adult. Why don't we just sentence him as an adult and get life in prison, natural life? I mean, that's the other side of the argument he's making. We're sentencing him as a juvenile back in 1993. And what his circumstance was, Judge Bacalus had available to him all of the reports that Judge Nugent had seen, correct? Yes. There wasn't as much live testimony, though. Some of those doctors weren't available. Is that also correct? Right. I do, however, think that Judge Bacalus did make note of the various mental health issues, things that had been testified to previously. He was mindful, again, of the circumstances at the time. He outlined the family situation at the time of the murders for Mr. Hargison. He outlined his education, his environment, various things. But he did find important that there were opportunities for Sean Hargison to not go through with this horrific crime. There were opportunities for him to say, no, I don't want to do that. But he gave consideration to the fact that he felt that there was pressure being put on the defendant by Mr. Robles. And so I think what he attempted to do was balance it. And he was extraordinarily aware of the fact that this was under the old sentencing statute so that their day-for-day credit was going to apply. He made that clear in his memorandum opinion and in his oral recitation. And he knew that this sentence was going to be a 45-year sentence, not 90 years, but 45 years. He just talked about the fact that he would be 62 years old when he got out of prison and that 62 years old would allow him to, you know, live his life with them, you know. I mean, did the state have to provide any sort of notice on their position of seeking an extended term? Our position is no. And the reason is this. We're in these post-Miller cases. We are in the resentencing cases. We're in a little bit of uncharted waters because the statutory scheme was set up when you would never have to consider extended term because if you killed two people, you were going to be mandatory natural life. So counsel took issue with my using Ford and with the trial court using Ford as a guide. But I think it is a guide. I mean, it's obviously not the same because this isn't a death case. But in essence what Ford says is the eligibility factor for death was already proven beyond a reasonable doubt. Therefore, anything below that is fair game and that's your time. So for purposes of notice, what are we seeking? In this case, that mandatory natural life has now become our eligibility, essentially our eligibility factor for enhancing the sentence because we can't apply it. We can't not enclose it mandatorily. But as this Court stated in general and then that's been, you know, accepted by the Supreme Court, natural life is still on the table just in a discretionary fashion for a double murder. So how does that occur? The statute says shall and for some reason we are now saying may. Can we rewrite that? Well, I think that the shall work. I think that the... Well, it says mandatory. Right, mandatory. Can we just substitute the word or is there some other way that discretion is introduced into this situation? Well, I think discretion is introduced obviously by the fact that the United States Supreme Court said you can't do it mandatorily, but there's no reason that you can't enclose natural life as long as you've considered these things and find these particular things. Of course, this isn't a natural life case now because Mr. Augustine didn't get natural life, but on resentencing obviously we did seek natural life and that was the top. I appreciate the concern about the statutory language. I would just say that again we have now, you know, several years' worth of law that has maintained that discretionary natural life remains on the table, and that certainly was the case at the time that we were sentenced here. And so when the defendant raised the issue of what is the sentencing range, the people said we are seeking natural life, the range is here, and we believe that everything below that is at the court's disposal for sentencing purposes. And so there's no... Okay, go ahead. I mean, did we have an obligation to notify them under the current statute? I would argue no because we're under the previous statute, but even if we did have an obligation to notify him, and for all intents and purposes he was notified, he almost, I mean, maybe he prematurely raised the issue of the range by his sentencing memo. So there certainly is no argument that he didn't understand that everybody believed that life was the top and that everything between 20 years and life was at the court's disposal for sentencing purposes. Did, I mean, you seem to argue, or not you personally in the trial court, but then you in your brief seem to argue that Ford says in addition to this position that, you know, he could have received the death penalty, but so it stepped down. Do you think the state has a burden in these sentencing hearings, resentencing hearings, to establish or point out any extended term factors? I do not think we have an obligation to do that. And why not? Well, again, because I think that in this scheme, when you have natural life as your, as a discretionary, you know, natural life becomes a discretionary sentence as well. So up into this is your range. And so the statutory scheme was never, it didn't contemplate this problem, quite frankly, because you never had a reason. Do I wish that they had said, oh, you know. Unfortunately, though, it may not have, but now I have to. Oh, of course. And I think, but again, I think that it's, that's why the answer to this lies in where is, what is your range? What are you on notice of? What, you know, if you can get natural life, then why wouldn't we be able to get 100 years, 90 years, 75 years? It makes absolutely no sense to say that you have to jump from 20 to 60 to natural life and everything in between is out the window. So again, this was litigated in the pre-trial, pre-sentencing motion. Yes. So before the sentencing began, everybody knew what the court's interpretation was in any event. The counsel suggested that SWIFT was controlling or offered guidance. I think SWIFT has a couple of problems. One is that in SWIFT, we're talking about a situation where there wasn't proof of the eligibility factor. So in this case, again, remember, we have this, you're high on this natural life, and it's proven beyond reasonable doubt because you've been proven guilty of two murders, and that's the eligibility for that natural life. Discretionary in this instance, mandatory in an adult instance. And then, and so we don't have the same issue that they had in SWIFT where there was no, where that top hadn't been proven. Well, excuse me. In SWIFT, wasn't he just found guilty of first-degree murder? Yes. I mean, any murder is terrible. Yes. Let's start with that premise. But there's nothing particularly horrible about the SWIFT situation. Well, there's certainly nothing that, there was nothing that would have made him eligible for any, you know, no finding by, in the guilt phase that would have made him eligible for anything over 20 to 60. And maybe there was no proof either. Perhaps. At sentencing, possibly. And I would note that SWIFT, you know, has been effectively overruled by CRESPO, and so I think that SWIFT just doesn't offer any guidance in this particular case. It's not useful to the analysis. I acknowledge the First District case in Morphin which suggested that when you send a case back for resentencing, it was a 2012 case, and when you send a case back for resentencing, post-mortem that, you know, I think the case actually says that, you know, 20 to 60, the extended term of the effector is proven and natural life. And our response to that is simply that that's just wrong because, again, that's the absurdity of saying you can get natural life because you've proven this double murder, but you can't get 75. So that really takes away, I mean, honestly that takes away a lot of leeway for the judge. I think, you know, arguably in this instance, you know, Judge McAllis is very concerned, as had Judge Elligan been, with the nature of this offense. And so I think that offering that range from 60 to 100 gave Judge McAllis a lot more leeway to say, you know, I'm not going to make this a natural life case anymore because I've got places to go. I think the absurdity that he would have had if he had to say, well, I have to go between 20 and 60, well, then I think he may well have said, no, you know, I can't say that 30 years is sufficient for this horrific killing of two people. Well, maybe it might have been more helpful for us to know what the thoughts were, but your position is it's not necessary. Certainly. I guess if the court doesn't have any other particular questions, I think I've covered everything that I would want to cover outside of the brief. Thank you very much. Mr. Cronson. Just a couple of court thoughts. I know I've taken up more than my amount of time. Boy, that's rare to hear. But we'll let you have your reply time. Thank you. I don't think that Swift has been overruled. I don't see anywhere that Swift has been overruled. I know it's been distinguished. I don't think she said overruled. Oh, okay. I thought she said overruled. No, I think she said it's of not much value here is, I think, the actual language she used. Okay. Because there were certain facts proven that did not go beyond the 20 to 60 range. Here we have facts found, at least in her position, facts found beyond a reasonable doubt that take us beyond there, and that was done by a jury. Okay. And the fact being found beyond a reasonable doubt is that two people were murdered? That's one of them. Okay. I don't dispute that. But that wouldn't be a basis under the statutory scheme to sentence Shawn Hullison to an extended term or to natural life imprisonment. That's not one of the factors that's enumerated in 3.2b. Well, the murder of two people is natural life. It was natural life, but that's unconstitutional as applied to Mr. Hullison. Mandatory. Yes. And, again, I'm trying to translate maybe her argument for you, but I'm looking at Miller that says the mandatory part is unconstitutional. Okay. So it might, there is, and Luciano says, and I was on Luciano, that all of those other issues are available provided there are proper findings, essentially. Okay. So the question is, is that what happened here? Okay. And I don't know what your intentions were in Luciano, but just as a practitioner reading Luciano, the only thing I see in Luciano, and I think it was Justice Burkett, right? Why was there two? That wrote the opinion. And so Justice Burkett, of all of us, would know what the requirements are in order to give an extended term, because he was the State's attorney, coincidentally, at the time of this case. But I'm just saying that because he has an extensive background in the procedural requirements, so he would know that you have to give notice and you have to let the defendant know on what basis you're seeking to impose an extended term or on what basis you're seeking. So I didn't read Luciano as saying, our holding here is that everybody who comes back for remand on resentencing as a juvenile lifer, everything's on the table with nothing more. I think if you read his opinion, and I don't, you know, obviously, you were there so you probably know better than me, but that's what a practitioner would read into his opinion there. And then when you juxtapose that with morphine, I don't see how it's a valid argument that everybody who comes back for resentencing, it's just, you know, life is the top and we don't have to tell you on what basis we're seeking life or an extended term if we are. But, you know, I think that argument is problematic here because there was extensive pre-sentencing argument and briefing on this very issue. What type of notice do you feel it was not given? The fact that, A, we're seeking an extended term, whether it's the 20 to 100, or I'm sorry, 60 to 100 for life. B, here's the basis that we're seeking it on. And I didn't really include Gaut in here with the thought that this court would adopt Gaut as its reasoning, but it's forward-looking. But when you look at the rationale in Gaut, this is the same argument that the state is making here, that the state made in front of that Circuit Court of Appeals, which is, well, you knew we were seeking an add-on. You knew it was for something to do with the gun. Now, the fact that we didn't get it right, that's not, you know, that shouldn't be a problem. We shouldn't have to tell you explicitly what we're doing and how we're going to try to do it. It's good enough that there's some notion of notice and that maybe the things that were brought out during the trial proceeding, those would have given you notice. And the Circuit Court of Appeals flatly rejected that. They said notice is notice, and you have to comply with the notice requirements that are written in the law. So in our law, both in our statutory scheme, which was adopted pursuant to Apprendi and our obligation to follow Apprendi, I just don't see that the state has properly followed it here. And I think it's an oversight on their part that should not be held against the defendant. Thank you. All right. Thank you. Counsel, thank you for your arguments this morning. They have been enlightening and helpful. And we will take the matter under advisement.